# Grubb's Appeal.

1. Parties owned ore-land as tenants in common; they entered into partnership in manufacturing iron and bought other real estate. The proceeds from the land and the purchase-money of the real estate were carried into the firm books with the partnership transactions. *Held*, that these circumstances did not make the land and the proceeds firm property.

2. Each party used the ore without requiring the other to account and there was no known excess to be paid for as the business progressed. Being a voluntary delay of both, interest was properly chargeable only from the time the balance was struck.

3. C., one partner, contracted to sell ore from the common property to H. for a particular furnace, to be paid for in iron from that furnace, E., the other party, declining to join. E. and P. afterwards bought H.'s furnace, so that he could not furnish iron. *Held*, that the contract with H. did not run with the land, and E. after the purchase was not responsible to C. on it.

4. E. gave indemnity to H. against damages to C. for failing to fulfil his contract. *Held*, that this created no liability on E. to C. on account of H.'s contract.

5. The indemnity created no privity between E. and C.

May 26th 1870.    Before THOMPSON, C. J., AGNEW and SHARSWOOD, JJ.

In the matter of the accounts of Edward B. Grubb and Clement B. Grubb, trading as E. & C. B. Grubb, sur exceptions to the report of the master appointed by the Supreme Court in appeals from the decrees of the Court of Common Pleas of *Lancaster county*: In Equity: No. 49 and 74, to May Term 1869.

On the 1st of August 1860, a bill was filed by Edward B. Grubb against Clement B. Grubb; the plaintiff having died, E. Burd Grubb, his administrator, was substituted.

The bill set out that H. B. Grubb died intestate, seised of several tracts of land in the counties of Lebanon, Dauphin, Lancaster and York, including one-sixth of the Cornwall ore-banks in Lebanon county and the right to dig and carry away ore from lands adjoining the banks, and the right to all the ore in the Chestnut Hill ore-bank, in Lancaster county; on this real estate there were a furnace and two forges; that H. B. Grubb left to survive him a widow and seven children, amongst whom were the plaintiff and defendant, and that under proceedings in partition in 1836, the real estate, including the ore-rights, was adjudged at the valuation of $175,000 to the plaintiff and defendant, who entered into partnership in mining ore and manufacturing and selling iron,

and brought the whole of the real estate into partnership, which continued till 1855, when it was dissolved by the defendant; that the interest and part of the shares of the widow and heirs of H. B. Grubb were paid by partnership funds; that with partnership funds the firm erected three other furnaces and for partnership purposes they purchased the fee of the Chestnut Hill ore-bank; that their interest in the Cornwall and Chestnut Hill ore-banks, and all the other real estate, had always been held in partnership, and they had worked the ore-banks for partnership purposes and with partnership funds, employed agents, kept books of account amounting to not less than $2,000,000, and no account had been settled between them; that plaintiff had on some occasions sold iron in his own name, but always for the firm, and had always been ready to account for that as ore taken for his separate use; that the defendant claimed the right to take ore for his exclusive benefit, and had sold ore and made contracts for sale, and pretends that by accounting for the ore at a price less than its value, and than he received for it, he is entitled to the profit of its sale for his own use, and refuses to allow the firm or the plaintiff to participate in the profit, and would not account; that in 1853 the defendant erected a furnace near the Chestnut Hill bank, and had since taken ore to supply it from that bank, and although the ore thus taken by the defendant had, up to the dissolution in 1855, been mined at the expense of the firm, the defendant refused to account for it except as above stated; that the defendant in 1855 gave notice that he dissolved the firm, but the ore-banks and other property were undivided, and he continued to use and sell the ore for his own benefit without accounting for it; that under a bill filed by R. W. Coleman for an account of ore taken from Cornwall banks, a decree had been made against the other owners for an account at the market value, by which the interests of the plaintiff and defendant therein were made a unit, and the plaintiff was jointly chargeable with ore taken by the defendant, but the defendant would not allow the plaintiff any of the ore taken by him or the proceeds, nor make any settlement; that there remained charged on the real estate and ore-banks $30,000 unpaid purchase-money and the balance of the share of one of the heirs; that judgments were obtained, and the real estate about to be sold, and although the liabilities could be paid out of the property, and the defendant, because of his indebtedness to the plaintiff in a larger amount, should have paid the whole, the plaintiff consented to make an arrangement with the defendant to pay the liabilities and raised his own share, when the defendant refused to carry out the arrangement; that the liens were transferred to Brooke & Coates (Brooke being a brother-in-law of the defendant), who demanded that the plaintiff should pay one-half of the liens from

his separate estate, or else they would sell property no longer belonging to the defendant; that there were other debts of the firm for which judgments had been obtained, and although the defendant had consented that one tract should be sold in separate parts to pay these debts, he afterwards refused to have it sold except as a whole, which would be equivalent to preventing a sale except at a great sacrifice; that the plaintiff was about effecting an arrangement by which the debts would be speedily paid by the sale of ore, but the defendant claiming a right to take as much ore as he wanted for his own furnace, and to pay the lien of Brooke & Coates, forbad the plaintiff's miners to mine; that the arrangement with Brooke & Coates was for the defendant's benefit, and should not deprive the plaintiff of the use of the mines or of his equity of paying joint debts from joint property; that the defendant had induced parties who had agreed to take ore from the plaintiff to make contracts with the defendant alone, and would claim as he had done since 1853, that such sales were for his exclusive benefit, and he was not bound to account for the profits; that the non-payment of the firm-debts had injured plaintiff and impaired his credit; that the estate of the firm, although of immense value, is liable to be sold for their debts, all of which could be paid by the profits arising from the property, or a sale of part of it, or by payment of the balance due by defendant; that no final settlement has been made, that upon such a settlement a large balance would appear to be due by the defendant, who refused to make a fair account of ore taken by him or settlement of the partnership transactions, and refusing to provide for payment of the debts, continued to use and sell the ore for his own benefit to the loss of the plaintiff and risk of his estate and property.

The prayers were—

1. For an account of ore taken from Cornwall and Chestnut Hill, and decree of payment of what might be due plaintiff.

2. For an account of the partnership transactions and payment to plaintiff.

3. For a receiver.

4. For partition, and in the mean time an injunction against the defendant from using and selling ore.

5. General relief.

By his answer filed April 2d 1860, the defendant averred that the real estate was adjudged to him and the plaintiff as tenants in common, and had so continued; the partnership was carried on at Mount Hope, Mount Vernon, Manada and Codorus furnaces; he denied that it was part of the business of the firm to mine ore for sale, or that the firm was ever engaged in selling ore; the firm continued in active operation till 1841, when they ceased at Manada and Mount Hope; they leased Manada as tenants in common; in 1843 they ceased at Mount Vernon, which they leased

[Grubb's Appeal.]

as tenants in common; the defendant conducted Mount Hope on his own account from 1841 to 1844, when he sold his interest as tenant in common in it to his brother, A. B. Grubb; in 1847 he sold his interest in Mount Vernon to the same brother, who transferred his interest in the valuation money payable on the death of their mother; the plaintiff since 1841 had resided in New Jersey; in 1849 the firm ceased business at Codorus, and their affairs were entirely closed by R. N. Arms, their agent for that purpose, and the business of the firm ended; with an exception to be mentioned; the payments of the valuation out of firm funds were made for convenience only, not because of any firm interest in the real estate; this was proposed and understood by plaintiff; the entries relative to the real estate were made in the firm books for convenience, not to introduce the real estate as part of the assets; all deeds to and from them treated them as tenants in common; the real estate was never treated or regarded nor was it partnership property; since 1843 all payments of valuation money were from their separate funds, resulting from the sale and leases of their common property, and other individual resources; sales of ore were made by each party in his own right as tenant in common and not as partner; no entries of such sales had been made since 1851 (when the business of the firm ended), in the firm books, which since then have been in the plaintiff's possession; the only operation of the firm since 1849 was an agreement in September 1851 between the defendant and the firm, by its agent R. N. Arms, with the consent of the plaintiff, by which the firm was to raise, sell and deliver to the defendant all the ore he might want at Henry Clay Furnace until April 1st 1853, under a contract with John Haldeman; the agreement was verbally extended until October 1853, when the plaintiff having acted in a manner hostile to defendant's interest, he notified plaintiff of his determination to dissolve the partnership, and it was dissolved October 1st 1853; defendant denied indebtedness to the plaintiff on the firm account or any other, but believed plaintiff was indebted to him; since October 1853 each had taken ore from the premises as tenant in common, for which each was liable to the other.

The defendant alleged that in 1851 the price of iron was depressed, and he, believing it would advance and to make the lands profitable, entered into contracts to continue for some years to avail himself of the anticipated rise in the price of iron, the ore under the contracts to be paid for in pig-iron at specified prices; one of the contracts was in 1851, with John Haldeman, for a supply to the Henry Clay Furnace for five years at $6.50 per ton of the iron made, to be paid for by pig-iron at $16 per ton, Haldeman to make at least 2000 tons per annum. After solicitation to the plaintiff to unite in this contract and he had refused, for the purpose of fixing the price of the ore between the

plaintiff and defendant, and as the firm had the necessary apparatus for raising the ore, it was agreed that the firm, through R. N. Arms, agent, should raise and deliver to the defendant, from September 23d 1851 to April 1st 1853, all the ore he wanted for his furnace—Chestnut Hill ore at $1.50 per ton, and the defendant might take ore from Cornwall at $1 per ton; that defendant so received ore and delivered it to the furnace until October 5th 1853, and Haldeman, till June 1st 1853, delivered manufactured iron to the defendant.   In July 1853 the price of iron having advanced, the plaintiff asked to participate in the profits of the contract, and the defendant declining, plaintiff purchased one-half of the Henry Clay Furnace, and entered into partnership with P. Haldeman, he purchasing the other half.   The plaintiff afterwards indemnified J. Haldeman against his contract with defendant which he repudiated, and refused to receive any more ore or deliver any more iron, but furnished all the ore from the furnace from their common property.   The defendant claims that plaintiff shall account for all the profits which defendant would have made from this contract.   In 1854 the defendant having filed a bill against the plaintiff and P. Haldeman for specific performance of J. Haldeman's contract, the plaintiff in his answer alleging that the partnership with the defendant existed, the defendant in February 1855 gave him notice of dissolution, but the defendant avers that it was dissolved in October 1853; he denied that any debts were unpaid, or that any judgments had been recovered which were unpaid; he denied the right of plaintiff to claim an account for the Cornwall ore pending Coleman's proceedings; defendant had always furnished to plaintiff, when requested, full and correct statements of ore taken by him, and had endeavored to effect a settlement, and for this purpose referees were mutually chosen, but before they could act the plaintiff revoked the submission.   The defendant proposed that each should pay one-half the judgments obtained against them for the valuation money; but the plaintiff refused unless defendant would release damages on the J. Haldeman contract.   To prevent a sale by the sheriff, defendant negotiated a transfer of the judgments for the valuation to Brooke & Coates, they paying in cash and acceptances; the defendant, on behalf of himself and plaintiff, to pay, besides costs, the expenses amounting to $1200, Brooke & Coates to stay execution until the maturity of the acceptances, defendant to furnish them iron on commission to meet the acceptances; the defendant contracted for the sale of ore payable in iron which he delivered to Brooke & Coates, the net proceeds to be applied to their acceptances; defendant expected in this way to discharge the balance due on the judgments; he denied that he had interposed any obstacle to the sale of Manada, or forbade any miner of plaintiff's to mine on the

[Grubb's Appeal.]

property, or that there was anything done by him to plaintiff; but averred his belief that there was a balance due from plaintiff to him.

A general replication was filed, and George M. Kline, Esq., was by agreement appointed master with authority of examiner, &c.

Amongst other things the master charged the Chestnut Hill ore at 85 cents per ton and the Cornwall ore at 75 cents per ton, as being the value of ore-leave at the respective ore-banks.    In conclusion he found that the plaintiff was indebted to the firm of E. & C. B. Grubb in the sum of $31,727.09, and the defendant in the sum of $86,928.32, and the defendant was therefore indebted to the plaintiff in the sum of $27,600.61.

On exceptions the Court of Common Pleas reformed the report by reducing the amount due from the defendant to the plaintiff to $23,014.93.

Both parties appealed to the Supreme Court.

When the appeals came up for hearing in the Supreme Court, the whole case was referred to Samuel Robb, Esq., as master of that court.

The master reported the title to the real estate and the formation of the partnership, &c., as set out in the pleadings; he further reported: The valuation money of their real estate was to be paid by its use and the ore dug from it, the real estate and ore-rights were not conveyed to the firm, but for convenience and to avoid multiplication of accounts, the property was entered in the firm books, and carried through the firm accounts.    The parties having bought the fee of the Chestnut Hill ore-banks, they took the title as tenants in common, and for the same reasons it was carried into the firm accounts; they erected the other furnaces mentioned in the pleadings and paid the expenses out of firm funds.    Both attended personally to the business when the plaintiff moved to New Jersey.  Several of the furnaces were rented at different periods from 1841 to 1849.   Up to 1843 the payment of interest to the widow and coheirs, and on account of their shares of the valuation, was from the money of the firm.   The business of the firm ended in 1849, with a single exception in 1851 which continued till in 1853.

On the 13th of March 1851 the parties referred their matters to three referees who were to fix the amounts due them respectively for services to the firm since June 1836; the referees settled their ore accounts to 1849, their accounts for services till 1851, and reported a balance of $5265.73 due to the defendant, February 7th 1853. After 1853 the plaintiff claimed that the firm was undissolved; the defendant in consequence, on the 6th of February 1855, gave plaintiff a formal notice of dissolution, and gave also public notice by advertisement.    The accounts submitted to the master, by agreement, included all items from the beginning of 1849 to December 31st 1861.

[Grubb's Appeal.]

" Each of the said parties used or sold ores dug or mined from the said property, employing the tools, implements and machinery belonging, so far as it appears, to them jointly, and each of them supplying money from time to time as it was wanted, for their several or joint benefit.

" There is no dispute as to the quantities taken by each of the said parties, but it is claimed by the plaintiff that they should account as partners, either at the prices for which the ores were sold, or else for profits actually received, and, on the other hand, by the defendant, that they should account as tenants in common, and for ore-leave simply."

In 1857 and 1859 judgments for about $31,500 were recovered against the parties for unpaid balances of the valuation money due two of the sisters, Mrs. Parker and Mrs. Ogilvie; under these judgments the Chestnut Hill ore-bank was levied on and was advertised to be sold on the 13th of August 1859. To prevent sacrifice the defendant proposed to the plaintiff that each should pay one-half of the judgments, this the plaintiff refused, except on terms deemed inadmissible by the defendant. The defendant then, without the knowledge of the plaintiff, effected an arrangement with the judgment-creditors and the firm of Brooke & Coates, by which that firm agreed to assume the payment of the judgments, and accordingly paid $13,000 on the 10th of August 1859, and for the remainder gave acceptances running from six to twelve months. In consideration of this assumption, the defendant agreed to furnish to Brooke & Coates on commission, iron sufficient to meet the acceptances, and to fulfil this agreement he sold iron ore to certain iron masters from whom he received in payment notes which produced $34,638.40, and pig-iron which was sold by Brooke & Coates, and the net proceeds amounting to $24,175.25 more applied to the acceptances. The judgments were marked to the use of Brooke & Coates in 1860 and 1861. A controversy arose in closing the transaction with Brooke & Coates, which was finally settled by a decision of the Supreme Court, reducing the claim made by them by about $3500. This matter was attended to exclusively by the defendant, who paid all costs and counsel fees. He claimed that he should account for the amount realized from 37,337 tons of ore, viz.: $58,813.65; should be credited with cost of raising it at $1.15 per ton $43,019.07, costs and counsel fees $843.94, amount of the judgments including the costs and counsel fees of the judgment-creditors $35,328.66, and commissions for his services 10 cents per ton $3733.66. The plaintiff claimed that as the arrangements had been made without his knowledge, and as to counsel fees to judgment-creditors, against his consent—at a time when defendant owed him almost, if not altogether, the amount of the judgments, the defendant should

account for this as for other ore taken by him, and should not be allowed for costs, counsel fees or commissions.

The parties were owners, in 1842, of ore-rights, known as the "Bennett's Rights." Some dispute having arisen with other parties in regard to them, the legal title was conveyed to the plaintiff, and he removed to New Jersey in 1841, so that he might sue in the United States court. On the 18th of March 1842, the plaintiff executed a declaration of trust, "that if any net profits, benefits and advantages should be realized therefrom after defraying the charges of litigation and all other expenses of realizing the same, then the said profits, benefits and advantages shall accrue to the use, and form a part, of the moneys of the said Clement B. Grubb and myself, copartners under the firm of E. & C. B. Grubb." A suit was brought in the Circuit Court of the United States, which was compromised in 1854. The plaintiff charged himself with $8000, the proceeds of the compromise, and claimed a credit for $3000, his expenses, "by becoming a citizen of New Jersey for the purpose of bringing suit in the United States court to try these rights."

On the 12th of September 1851, the defendant (the plaintiff declining to join with him) made a contract to supply John Haldeman with all the ore from the Chestnut Hill and Cornwall mines he might need at Henry Clay Furnace, for five years, from December 1st 1851, at the rate of $6.50 for every ton of pig metal made out of the ore, to be paid for in pig metal at $16 per ton at the furnace, or $18 at Philadelphia.

The defendant, in order to fix the price of the ore as between him and the firm, endeavored to make an arrangement with them for delivering the ore during his contract with J. Haldeman. The firm declined to do this, but, through R. N. Arms, their agent, on the 24th of September 1851, contracted to deliver ore to him until April 1st 1853 from Chestnut Hill at $1.50 per ton, and to sell him ore-leave at Cornwall at $1 per ton, to be paid for at times specified in the contract. On this contract, the defendant advanced $3378.72, from September 30th 1851 to March 23d 1853, to raise ore.

The defendant continued to take ore to supply J. Haldeman until June 1st 1853. In the mean time, the price of iron had advanced to $35; the plaintiff then asked to share in the Haldeman contract, but the defendant refused. In May 1853, J. Haldeman wishing to sell the Henry Clay Furnace, the plaintiff proposed to the defendant that they should buy it; the defendant declined, and afterwards, on the 7th of June, the plaintiff bought an undivided half of the furnace; P. Haldeman about the same time bought the other half. The plaintiff and P. Haldeman worked the furnace together, and ore was obtained from the two banks until Oct. 1853. Metal had been delivered to defendant July 1st and

August 1st 1853, he supposing that the ore had been obtained and the metal delivered under his contract with J. Haldeman and his arrangement under the Arms contract.   Here the parties differed; P. Haldeman was willing, as to his half of the furnace, to proceed as under the J. Haldeman contract, "but the plaintiff insisted on his equal right to the ore, and refused to pay for his half in metal, and the defendant refused to receive metal for Peter Haldeman for half only, and insisted upon receiving it for all the ore used at the said furnace."

The defendant, on the 6th of September 1853, commenced an action of covenant against J. Haldeman on his contract.

On the 3d of October 1853, an agreement was made between the plaintiff and J. Haldeman, which, after reciting the circumstances relating to the contract between Haldeman and the defendant, the sale of Henry Clay Furnace, &c., proceeded:—

"And whereas, notwithstanding the premises, the said Clement B. Grubb has brought suit against the said John Haldeman, on the said agreement made with him; and whereas, it would be unjust that the ore used for said furnace should be twice paid for, or that the said John Haldeman should be made to pay for ore he does not require, when such ore for the said furnace is to be accounted for to the said Clement B. Grubb as aforesaid.

"Therefore, in consideration of the premises, and of one dollar in hand paid by the said John Haldeman, I, Edward B. Grubb, do hereby covenant and agree to and with the said John Haldeman, his heirs, executors and administrators, that in case in the said suit brought by the said Clement B. Grubb against the said John Haldeman, or in any other suit to be brought by the said Clement B. Grubb against the said John Haldeman, on the said article of agreement, the said Clement B. Grubb shall recover any sum or sums of money that I will pay the same to the said John Haldeman."

On the same day, plaintiff agreed with P. Haldeman to supply his half of the furnace with ore from June 1st 1853 to December 1st 1856, on precisely the same terms as those between the defendant and J. Haldeman.   At the foot of this contract was the following memorandum: "I acknowledge that Mr. Peter Haldeman has delivered to Clement B. Grubb on or about the 1st of July 1853, 47 tons of iron, and about the 1st of August 1853, 12 tons of iron on account of ore of E. & C. B. Grubb; and I do agree that the same is on account of this agreement."

In the suit of defendant against J. Haldeman, a non pros. was entered November 28th 1860.

On the 29th of May 1854, the defendant filed a bill in the Supreme Court against the plaintiff and P. Haldeman, praying that it might be declared that the J. Haldeman contract was binding on the plaintiff and P. Haldeman; that E. B. Grubb was

[Grubb's Appeal.]

not entitled to supply the furnace with ore; that the parties be compelled to perform the J. Haldeman contract, and be enjoined from using the ore, &c.   Answers were filed, but nothing further was done in the case.

J. Haldeman was insolvent when the present proceedings were commenced.   The defendant claimed that the plaintiff took the place and responsibilities of J. Haldeman in his contract.

The master stated the points of controversy to be:—

1. As to the character in which the said parties should account, whether as partners or tenants in common.

2. As to the prices with which they should be charged for the ore taken or used by them respectively, whether on the basis of the value of ore-leave, or of the price at which sold.

3. As to whether or not interest should be charged, and, if so, from what time.

4. As to the liquidation of the Parker and Ogilvie judgments.

5. As to the plaintiff's claim for credit under deed of trust, March 18th 1842, for expenses of removal to New Jersey.

6. As to defendant's claim for credit under the Henry Clay contract.

7. As to debits and credits for raising Chestnut Hill ore.

As to the 1st point the master found:—

"That this real estate was not brought into the partnership, but was owned and held by the parties as tenants in common, and that therefore they must account as tenants in common."

On the 2d point the master found:—

"As to the Cornwall ore, that the parties should account at the rate of 75 cents per ton, and as to the Chestnut Hill ore at 85 cents per ton, for all the ore taken by them respectively, excepting the ore taken by the defendant under the Arms contract, for which he should account at the price therein stipulated."

On the 3d point the master found that interest should be charged against the plaintiff on the balance struck by referees, February 17th 1853, from that date, and on ore furnished under the Arms contract from the times of payment specified in it; as to the remainder, from the time of closing the account.

On the 4th point:—

"Considering that the arrangement made by the defendant was not made for his individual benefit, but to save the common property from sacrifice, the master is of opinion that it would be inequitable to charge him for the ore as for other ore taken by him, or to refuse him credit for the money paid or disbursed by him. This will exclude the defendant's claim for commission of 10 cents a ton, or $3733.70, for the sale of this ore.   This claim cannot be allowed.   It is too well settled to be now disputed that partners, tenants in common, or parties jointly interested in an enterprise, are not entitled to compensation for services rendered in the com-

[Grubb's Appeal.]

mon business, in the absence of an agreement to allow it, and no such agreement has been shown."

On the 5th point he found that the plaintiff's expenses for his removal to New Jersey should not be allowed.

On the 6th point he found :—

"That whatever claim the defendant may have, it cannot be admitted as an item of account in the present proceedings, because (1) it is not within the scope of the account prayed by the bill; (2) it is a claim exclusively for unliquidated damages; and (3) the proper parties are not in court."

On the 7th point he reported :—

"The evidence does not show that either of the parties paid the expenses of raising ores used by the other; on the contrary, it appears by the testimony of John McClure, who was in the employ of E. & C. B. Grubb and did the mining, that money was sent to him by both of them, and as they are charged for the ores taken and used by them respectively on the basis of ore-leave only, it is evident they are not to be debited with or credited for money paid for raising. The only exception to this is the Chestnut Hill ore taken by the defendant under the Arms contract, for which he is charged at the pit's mouth, and he is therefore entitled and is allowed credit for money advanced for raising the same.

"It is admitted that the defendant paid the expenses of hauling the ore used at Henry Clay Furnace by the plaintiff between June 1st and October 1st 1853, and the latter therefore is charged and the former is credited with the costs of hauling the same." * *

The master attached to his report statements of accounts between the parties respectively and the firm of E. & C. B. Grubb.

In the account of E. B. Grubb he is charged from the cash-book of the firm with a balance of $1707.83. In making up that balance it appeared from the book that $2500 had been credited to him for that amount paid by him to John McClure for raising ore.

The final statement of the accounts between C. B. Grubb and E. B. Grubb, as of April 11th 1870, as reported by the master, is as follows :—

"1861. December 31st.

"C. B. Grubb's indebtedness to E. & C. B.
Grubb . . . . . . . $64,755.72
"Deduct E. B. Grubb's      do.      do.      do.      14,045.82

"C. B. Grubb's excess of indebtedness      . $50,709.90
"Deduct his one-half   .   .   .   .   .      . 25,354.95

"Balance due E. B. Grubb      .      .      . 25,354.95
"To interest from Dec. 31st 1861 to April 11th 1870,
8 years, 3 months and 11 days      .      . 12,597.18

"Balance due E. B. Grubb April 11th 1870 $37,952.13"

Both parties filed exceptions to the master's report.

The exceptions were argued in the Supreme Court by

*I. E. Hiester* and *T. E. Franklin*, for C. B. Grubb, and by

*E. S. Miller* (with whom were *C. B. Penrose, J. L. Reynolds* and *F. Watts*), for E. B. Grubb's administrator.

The opinion of the court was delivered, July 7th 1870, by

AGNEW, J.—This case has been so fully and ably examined and reported upon by Mr. Robb, the master appointed by this court, and his positions so well stated, a few comments only will be necessary in noticing the points of controversy, rather than the exceptions in detail.

His conclusion that the real estate was held in common by Edward B. Grubb and Clement B. Grubb, and not in partnership, is correct. This is not inconsistent with its use for partnership purposes, and its appearance in the partnership books to the extent made necessary for the use of the partnership in the iron business. The partnership was related to it very much as in a case where partners lease land to carry on their business. The parties being equal as tenants in common as well as equal partners, the use of the land would, in the settlement of their partnership account, be the same in its results to them, as if as partners, they had leased the land of themselves as tenants in common. Hence the payments by the partnership for the owelty in the partition has no weight in the argument, for the result would be the same as if each partner had drawn from the firm an equal sum and applied it to his share of the owelty as a tenant in common. It is evident the payments in owelty did not change the character of the title vesting in them as tenants in common, and especially the title of so much as each held primarily as an heir, for which no owelty was paid. For the same reasons the Arms contract has no particular bearing on the question. The partnership had been operating in mining ore, and was still in debt,—as the agreement shows, to Parker, who was to receive the proceeds of the contract,—and was in possession of the tools and other facilities for mining, so that the Arms contract was really nothing more than a prolongation of the partnership for the mere purpose of mining as a means of paying the firm-debt. As to the price of ore-leave, a majority of the court think that both masters having fixed upon the same prices for Chestnut Hill and Cornwall ore, it is not sufficiently evident they have made a plain mistake, and therefore, according to our rule, the report must be confirmed. To myself it has appeared differently. I cannot see the weight of evidence which led Mr. Kline to fix the prices so far below those the parties were actually selling at; and it seems to me Mr. Robb followed

Mr. Kline for the reason, that in differing from him he foresaw much perplexity in settling upon a satisfactory price. But the price of ore-leave, as shown by the Arms contract, and the defendant's own account as rendered in 1859, by his admissions to witnesses, his contracts with third parties, and prices at neighboring mines, are not satisfactorily reasoned away by the master. Nor can I see how the contracts for ore-leave in iron can be rejected as corroborative evidence, especially in view of the rise of prices from $16 or $18 per ton for iron up to $34 and $35.

We concur with the master as to the interest with a single exception to be noticed. It is argued that this being a case of tenancy in common and not of partnership, the rule for interest should be as between tenants in common. But in a court of equity each case rests on its own circumstances, and cannot be made to fit a single unbending rule. Both parties were using the ore at pleasure, and without requiring each other to account. Annual balances were therefore uncertain. There was no known excess to be paid for as the business progressed. It was not a case of a wilful detention of the profits of the land, but a mutual and voluntary delay in settlement. We must look at their mutual course of dealing. Until called upon to account neither could complain of the other, and neither could claim a balance till the accounts of both were settled. There were strong reasons for this mutual indulgence. Much of the ore was taken to pay partnership-debts while the partnership was also taking its means to pay off encumbrances on their common estate. The whole case is therefore to be likened in its results to the settlement of a partnership account, in which interest has no place until a balance is struck. But there is an error in the interest charged on the Arms contract. In that contract Clement B. Grubb became a debtor to the firm, and was to pay the prices fixed in the contract at stipulated times. The master settled this account as for an individual debt, and therefore charges interest on the ore from the time it should have been paid for. But the account also shows that Clement B. Grubb advanced on the Arms contract, cash $3378.72, to mine ore under it. This sum should be credited in the calculation, as there is no principle which can make Clement B. Grubb liable for interest on the money advanced to carry out the contract. We see nothing to correct in regard to the liquidation of the Parker and Ogilvie judgments. The master has taken an equitable view of the matter. We apply the same remarks to the claim of the plaintiff for the expenses of his removal to New Jersey.

In the debits and credits for working Chestnut Hill ore there is one matter to be corrected.

The master settled the account of each party for ore on the basis of ore-leave, by deducting from the market value of the ore

16 P. F. SMITH—9

at the pit's mouth the cost of working it, &c., and for this reason he rejects both debits and credits, it being found that neither party had paid the expenses of working ores used by the other. To this there is no objection, the price of ore-leave being an equi table mode of accounting to each other. But by inadvertence, no doubt, he in effect credits E. B. Grubb with $2500, paid to John McClure for raising ore. This happened by charging E. B. Grubb with the balance due on cash book to the firm. But in that cash account E. B. Grubb has been credited with $2500, paid J. McClure for raising ore, reducing the balance from him to $1707.83, the sum debited by the master to E. B. Grubb in settling the account. Having rejected all debits and credits for raising ore by taking ore-leave as the basis of the charges, it is evident the balance of the cash book should be increased by adding to it the $2500 credited in it for raising ore.

The last matter which needs a special notice is the Henry Clay Furnace contract with John Haldeman. We shall add nothing to what the master has said as to the difficulty of administering the equity, if the defendant be supposed to have any, against the plaintiff, as representing John Haldeman. It seems to us, however, that there is quite as much difficulty in sustaining the alleged equity. The defendant, in order to fulfil his contract with John Haldeman, endeavored to effect an arrangement with the plaintiff for so doing, but failed to obtain from him a contract to furnish the ore to the Henry Clay Furnace beyond the 1st of April 1863, the period when the Arms contract was to end. This was notice, therefore, to the defendant, that the plaintiff would not furnish ore from their common property beyond that date. The plaintiff permitted the Arms contract to be carried out to the 1st of April 1853, and beyond until about the 1st of June. He then bought one-half of the Henry Clay Furnace from John Haldeman, in May 1853, and received the deed for it on the 7th of June 1853. This he had a right to do. The contract between the defendant and Haldeman was wholly personal and did not run with the land. The plaintiff's purchase, therefore, after the expiration of the Arms contract, cast no liability on him; and his share of the ore-land was not bound for the performance of the Haldeman contract.

Peter Haldeman, who was the purchaser of the other half of the Henry Clay Furnace, recognised the contract of the defendant with John Haldeman, and offered to accept the ore on the terms of that contract for his half of the furnace, but the defendant refused to accept his offer, and insisted on its entire performance, the effect of which would be to compel the plaintiff to extend the Arms contract beyond the period fixed by both for its determination. Down to this point there could be no claim against the plaintiff, in law or equity, to fulfil the Haldeman con-

[Grubb's Appeal.]

tract.    How did the indemnity change the state of the case?    It was not given until the 3d of October 1853, and so far as the time or anything found as a fact, it constituted no part of the terms of the plaintiff's purchase of the one-half of the Henry Clay Furnace.    It has no connection, therefore, with the tenancy in common or the partnership transactions.    John Haldeman had then no connection with the furnace.    His liability to the defendant was purely personal.    By the indemnity the plaintiff created no privity between himself and the defendant; he did not undertake to fulfil, but rather to defend against a contract already broken, and the consideration of his undertaking does not appear to be connected with the joint property of the parties.    The defendant could have no right of action on the indemnity, and there would appear to be no ground on which it could be brought within the sphere of the settlement of the partnership accounts or their tenancy in common.    We perceive no ground for correcting the report on this head, and on the whole case we leave the report of the master to answer any other matter not touched upon in this opinion.

The result of the corrections above mentioned will stand thus :—

### C. B. Grubb Dr. to E. B. & C. B. Grubb.

| | |
|---|---:|
| For balance per Master's Report    .    .    .    . | $64,755.72 |
| Credit by interest on $3378.72, paid on Arms contract, say eight years .    .    .    .    .    . | 1,621.78 |
| | $63,133.94 |

### E. B. Grubb Dr. to E. B. & C. B. Grubb.

| | |
|---|---:|
| For balance per Master's Report    .    .    .    . | $14,045.82 |
| Add error in balance of cash book .    .    .    . | 2,500.00 |
| Balance .    .    .    .    .    .    .    . | $16,545.82 |
| C. B. Grubb's balance   .    .    .    .    . | $63,133.96 |
| E. B. Grubb's balance   .    .    .    .    . | 16,545.82 |
| C. B. Grubb's excess    .    .    .    .    . | 46,588.12 |
| Deduct his half    .    .    .    .    .    . | 23,294.06 |
| Balance due E. B. Grubb's Administrator    .    . | 23,294.06 |
| Interest from Dec. 31st 1861, to July 6th 1870, eight years, six months and six days .    ·    .    . | 11,903.26 |
| Balance due to E. B. Grubb's Administrator, July 6th 1870 .    .    .    .    .    .    .    . | $35,197.32 |

[Grubb's Appeal;]

And now, July 6th 1870, the court confirm the report of the master with the above modifications, and decree that C. B. Grubb do pay to the administrator of Edward B. Grubb the sum of $35,197.32, with interest from the 6th day of July 1870, and the costs of the suit.